No. 20-7185

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

EMMANUEL KING SHAW,
*Plaintiff-Appellant*,


v.


T. S. FOREMAN, Unit Manager; M. MURPHY, Unit Manager;
T. LEABOUGH, Hearings Officer; N. LEACH, Counselor;
and F. L. ADAMS, Lieutenant,
*Defendants-Appellees*.

---

On Appeal from the United States District Court for the
Eastern District of Virginia, No. 1:18-cv-01286-CMH-IDD
Hon. Claude M. Hilton

---

## BRIEF FOR APPELLANT

---

DANIEL S. SEVERSON
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dseverson@kellogghansen.com

*Counsel for Plaintiff-Appellant*


May 18, 2022

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 3

STATEMENT OF THE ISSUES .......................................................... 3

STATEMENT OF THE CASE .............................................................. 4

I.     Factual History ......................................................................... 4

       A.    Shaw Receives a Disciplinary Charge and Is Confined in
             Pre-Hearing Segregation ................................................... 4

       B.    Shaw Writes Complaints and Letters to Richmond .............. 4

       C.    Shaw Is Convicted and Sent to Red Onion Without
             Review of Video Evidence .................................................. 9

II.    Procedural History .................................................................. 11

       A.    Shaw's Pleadings ............................................................. 11

       B.    The District Court's Orders Dismissing Shaw's Claims ...... 13

       C.    This Appeal .................................................................... 15

SUMMARY OF THE ARGUMENT ................................................... 15

STANDARD OF REVIEW ................................................................ 17

ARGUMENT .................................................................................. 19

I.     Shaw's Retaliation Claim Survives Summary Judgment ............. 19

       A.    Shaw Engaged in Protected First Amendment Activity ...... 20

       B.    Defendants' Conduct Adversely Affected Shaw's First
             Amendment Rights .......................................................... 21

       C.    Shaw Made Out a Prima Facie Case on Causation ............. 27

i

D.     The District Court Erred in Granting Summary Judgment
        Before Any Discovery Occurred ........................................................35

II.     Shaw Stated A Procedural Due Process Claim .............................................37

        A.     Shaw Adequately Alleged a Liberty Interest in Avoiding
                Erroneous Transfer to a Supermax Prison ...........................................37

        B.     Shaw Adequately Alleged a Due Process Violation when
                Defendants Refused To Review "Exculpatory Video
                Evidence" ............................................................................................42

        C.     The District Court Erred in Dismissing Shaw's Due
                Process Claim ......................................................................................47

III.    On Remand, Counsel Should Be Appointed To Litigate Shaw's
        Civil Rights Claims..........................................................................................50

CONCLUSION ..................................................................................................53

REQUEST FOR ORAL ARGUMENT ................................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

**CASES**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)....................................37

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................17

*Bishop v. Wood*, 426 U.S. 341 (1976) ......................................................17

*Booker v. South Carolina Dep't of Corr.*, 855 F.3d 533
(4th Cir. 2017) ..............................................................20, 21, 46

*Bradley v. School Bd. of Richmond*, 416 U.S. 696 (1974) ......................48

*Brooks v. Johnson*, 924 F.3d 104 (4th Cir. 2019)........................2, 19, 51

*Burgos v. Hopkins*, 14 F.3d 787 (2d Cir. 1994)...............................18, 45

*Butts v. Aurora Health Care, Inc.*, 387 F.3d 921 (7th Cir. 2004)...........29

*Causey v. Balog*, 162 F.3d 795 (4th Cir. 1998) .....................................27

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................35, 36

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001) ......................28

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ...................................................21, 28

*Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999) ...............18

*Freeman v. Rideout*, 808 F.2d 949 (2d Cir. 1986)..................................48

*Gibbons v. Higgins*, 1995 WL 761743 (7th Cir. Dec. 20, 1995)
(judgment noted at 73 F.3d 364) ..............................................22

*Gordon v. Leeke*, 574 F.2d 1147 (4th Cir. 1978)...................24, 31, 42, 50, 51

*Greene v. Doruff*, 660 F.3d 975 (7th Cir. 2011) ...............................34-35

*Gregg-El v. Doe*, 746 F. App'x 274 (4th Cir. 2019) .....................27, 28, 32

iii

*Haines v. Kerner*, 404 U.S. 519 (1972) .................................................................41

*Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214
    (4th Cir. 2002) ....................................................................................35, 37

*Hayes v. Walker*, 555 F.2d 625 (7th Cir. 1977)....................................................43

*Incumaa v. Stirling*, 791 F.3d 517 (4th Cir. 2015) ......................................37, 40, 41

*Jehovah v. Clarke*, 798 F.3d 169 (4th Cir. 2015) ....................................................18

*Jiggets ex rel. S.J. v. Long*, 510 F. App'x 278 (4th Cir. 2013)...............................29

*LaMar v. Ebert*, 681 F. App'x 279 (4th Cir. 2017) ......................................18, 42, 50

*Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) ............................2, 16, 19, 22, 34,
                                                      42, 44, 45, 46, 48

*Martin v. Duffy*:

    858 F.3d 239 (4th Cir. 2017) ..................................................6, 18, 20, 21, 22,
                                                       26, 38, 39, 40, 41

    977 F.3d 294 (4th Cir. 2020) ..........................................2, 16, 18, 19, 24, 27,
                                                       28, 29, 34, 36, 45, 51

*McCray v. Maryland Dep't of Transp.*, 741 F.3d 480 (4th Cir. 2014)...................35

*Melgar ex rel. Melgar v. Greene*, 593 F.3d 348 (4th Cir. 2010) ............................46

*Peterson v. Shanks*, 149 F.3d 1140 (10th Cir. 1998)..............................................27

*Pledger v. Lynch*, 5 F.4th 511 (4th Cir. 2021) ................................17, 35, 36, 37, 51

*Prieto v. Clarke*, 780 F.3d 245 (4th Cir. 2015)......................................................38

*Putney v. Likin*, 656 F. App'x 632 (4th Cir. 2016) ................................................35

*Raynor v. Pugh*, 817 F.3d 123 (4th Cir. 2016) ................................................17, 35

*Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) ........................................35-36

*Sandin v. Conner*, 515 U.S. 472 (1995)..................................................................38

iv

*Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243 (4th Cir. 2005) ...................... 18, 50

*Smith v. Collins*, 964 F.3d 266 (4th Cir. 2020) .................................................. 40, 49

*Smith v. Massachusetts Dep't of Corr.*, 936 F.2d 1390 (1st Cir. 1991) ............ 42, 43

*Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002) ........................................................ 18

*Wagner v. Wheeler*, 13 F.3d 86 (4th Cir. 1993) ................................................ 33, 34

*Wilkinson v. Austin*, 545 U.S. 209 (2005) ......................................................... 38, 40

*Williams v. Collier*, 357 F. App'x 532 (4th Cir. 2009) ........................................... 51

*Wilson v. Layne*, 526 U.S. 603 (1999) ................................................................... 47

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................ 42, 46, 47

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const.:

   Amend. I ................................................................................................ *passim*

   Amend. XIV, § 1 (Due Process Clause) ....................................................... 37

28 U.S.C. § 1291 ....................................................................................................... 3

28 U.S.C. § 1331 ....................................................................................................... 3

28 U.S.C. § 1343(a)(3) .............................................................................................. 3

28 U.S.C. § 1915(e)(1) ............................................................................................ 50

28 U.S.C. § 1915A .................................................................................................. 18

28 U.S.C. § 1915A(b)(1) .................................................................................... 13, 48

42 U.S.C. § 1983 ..........................................................................................2 11, 29, 51

Fed. R. Civ. P.:

Rule 56(a) ...................................................................................17

Rule 60(b)(3) ...............................................................................14

Virginia Dep't of Corr., Operating Procedure 861.1 (Jan. 1, 2016,
    last amended Nov. 6, 2017), https://vadoc.virginia.gov/
    media/1090/vadoc-op-861-1.pdf (https://perma.cc/9WBK-
    KSD7) ....................................................................6, 7, 33, 39

# INTRODUCTION

Emmanuel King Shaw, incarcerated in Virginia, was convicted of a disciplinary offense, received a maximum security level increase, and was transferred to a "supermax" facility after prison officials refused his request to review video evidence.  Shaw was accused of committing a lewd act while in the shower, but he consistently maintained that surveillance footage would show that he was not in the shower at the time of the alleged incident.  After being segregated in pre-hearing detention, Shaw submitted numerous complaints and wrote letters to officials outside the prison seeking to compel review of the video footage and secure his release from segregated detention, while also complaining that prison officials were manipulating prison operating procedures to subject offenders to unauthorized terms of segregated confinement.  Within days of seeking redress of his grievances, prison officials convicted him at a disciplinary hearing at which they refused to consider the video evidence—indeed, "chastised" him for requesting it—and approved his security level increase and transfer to Red Onion State Prison.

Shaw brought a civil rights complaint alleging that prison officials violated his rights to be free from retaliation for exercising his First Amendment rights and to procedural due process.  The district court erred in dismissing both claims. With respect to his claim that prison officials retaliated against him for filing his

grievances, Shaw presented sufficient evidence to raise a jury question.  The court

erred in granting summary judgment for defendants by applying the incorrect legal

standard, requiring Shaw to establish "but for" causation in the first instance in

violation of *Martin v. Duffy*, 977 F.3d 294 (4th Cir. 2020) (inmates asserting

First Amendment retaliation claims need only make out a prima facie case of

causation—that protected conduct was a substantial or motivating factor—before

burden shifts to defendants to prove a permissible basis for action taken).  And the

court erred by granting summary judgment without affording Shaw any

opportunity for discovery.

　　With respect to his procedural due process claim, the court erred by failing

to recognize that Shaw stated a claim that prison officials violated his rights when

they refused to review the relevant video evidence when convicting him of a

disciplinary offense and transferring him to a supermax prison.  *See Lennear v.

Wilson*, 937 F.3d 257 (4th Cir. 2019) (inmates at risk of being deprived of liberty

interest have qualified due process right to obtain and present prison video

surveillance evidence).

　　This Court should reverse the district court's orders and recommend that

the court on remand appoint counsel for Shaw to litigate his civil rights claims.

*See Brooks v. Johnson*, 924 F.3d 104, 122 n.9 (4th Cir. 2019) (advising that

"the court consider appointing counsel for [prisoner-plaintiff]" in § 1983 action).

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3). On July 16, 2020, the district court granted summary judgment to Defendants-Appellees. JA239-40. Shaw timely filed a notice of appeal, which was docketed on August 12, 2020. JA241-44. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the district court erred in granting summary judgment for defendants on Shaw's First Amendment retaliation claim when Shaw satisfied each element, including by making out a prima facie case of causation, before any discovery occurred.

II.     Whether the district court erred in dismissing Shaw's procedural due process claim when he alleged that prison officials convicted him of a disciplinary charge and sent him to a supermax prison after refusing to review video evidence at a hearing that occurred beyond the authorized deadline.

III.    Whether on remand the district court should appoint trial counsel to litigate Shaw's civil rights claims.

## STATEMENT OF THE CASE

**I.    Factual History**

**A.    Shaw Receives a Disciplinary Charge and Is Confined in Pre-Hearing Segregation**

On July 19, 2017, Shaw was informed that a disciplinary report had been written against him, alleging that he committed a 137A offense.  An officer in training who had been at the housing unit for only a couple of days accused Shaw of "stroking his penis" "in Housing Unit 4-A from shower #1 at 3:15 pm."  JA61, 81; JA184.  Shaw denied the charge and insisted that, at that time, "I was sitting on the stairs."  JA61.  Shaw asked the sergeant "to check the video evidence and he said that he would."  *Id.*

The next day, July 20, 2017, Shaw was moved to segregation to await a hearing, which was scheduled for July 27, 2017.  Shaw asked Lieutenant Dyson to review the video evidence, but "he refused."  JA62.  Shaw began to write and speak with officials to ask them to look at the video evidence, see that he did not commit the charged offense, and secure his release from segregation.  *Id.*

**B.    Shaw Writes Complaints and Letters to Richmond**

On July 21, 2017, Shaw wrote an Informal Complaint to Unit Manager Foreman.  He stated, "I've been trying to tell everybody to review the camera and see that, at the time of the incident, I was on the stairs by cell (18) sitting down and not in any shower."  JA79.  Foreman later responded that she was "not going to

4

review the rapid eye for this situation," i.e., the video surveillance footage, and that Shaw "can request the hearings officer to do so." *Id.* Shaw also spoke with Unit Manager Murphy, who supervised segregation pods, but he refused to get involved until after the hearing. JA62.

July 27, 2017 came and went without the hearing, and without it being rescheduled. JA201.

Shaw alleged that prison officials were subjecting offenders to "unauthorized terms of segregation" by deliberately delaying hearings: "Some offenders received continuance after continuance for up to and over (2) months before they were just released from segregation without a hearing." JA62. He explained that "being released from segregation without a hearing was better than the punishment to follow if you went to a disciplinary hearing and were found guilty of committing a (137) offense. Those offenders remained in segregation, on administrative segregation, where they received immediate security level increases and transfers to either of the two most restrictive prisons in Virginia which are Wallens Ridge State Prison and Red Onion State Prison." JA49.

On July 30, 2017, Shaw began a hunger strike as a peaceful protest of his assignment to segregation. JA62. On July 31, 2017, Unit Manager Murphy reviewed Shaw's detention status but did not release him. JA115-16 (¶¶ 10-12); *see* JA50. Shaw submitted an Emergency Grievance and another Informal Complaint

again insisting that he had been misidentified: "I've told this to everyone since before I was placed in seg[regation] but no-one has taken initiative to review the video in order to rectify the situation[;] meanwhile, I continue to be unfairly punished." JA81. Unit Manager Murphy later responded that "the hearings department will advise and resolve." *Id.*; JA62-63.

Counselor Leach and Lieutenant Adams personally participated in violating Shaw's constitutional rights because, while conducting door-to-door rounds, they knew that Shaw remained in segregation beyond the applicable deadline and despite his repeated requests to review the video evidence; yet they did not intervene. *See* JA64, 70, 75; JA210-11.

On August 4, 2017, the deadline to conduct a disciplinary hearing expired. Under the Virginia Department of Corrections' ("VDOC") January 1, 2016 Operating Procedure 861.1, there was a 15-day "deadline" for conducting a hearing after service of the disciplinary offense report:[1]

---

[1] Shaw provided excerpts of that procedure to the district court. *See* JA215; JA256-57. The VDOC website also contains a full version of the January 1, 2016 Operating Procedure 861.1, which has a last amended date of November 6, 2017 and states it was "reviewed . . . in January 2018." Operating Procedure 861.1 at 1, 40 (Jan. 1, 2016, last amended Nov. 6, 2017) ("2016 VDOC OP 861.1"), https://vadoc.virginia.gov/media/1090/vadoc-op-861-1.pdf, *also available at* https://perma.cc/9WBK-KSD7. This Court "may properly take judicial notice of this policy as a public record under Federal Rule of Evidence 201(d)." *Martin v. Duffy*, 858 F.3d 239, 253 n.4 (4th Cir. 2017).

6

XIII.  TIME LIMITS RELATED TO DISCIPLINARY HEARING

A.  The OIC will schedule the case for a Disciplinary Hearing.

. . .

2.  If the offender has been placed on [pre-hearing detention] or any other detention status for the *Disciplinary Offense Report*, the hearing should be held no sooner than midnight of the second working day and no later than 15 calendar days after service of the *Disciplinary Offense Report*, unless a valid reason exists.

3.  If an offender has been physically moved to general population before the expiration of the 15-day time limit, the time limit for hearing the *Disciplinary Offense Report* will be 30 calendar days.

. . .

B.  Authorized Continuances (4-4239)

1.  An Authorized Continuance is required for a hearing not completed within 30 calendar days after the initial service of the *Disciplinary Offense Report*, or 15 calendar days if the offender is assigned to [pre-hearing detention].  The Hearings Officer shall notify the offender of the continuance by using *Notice of Continuance* (see sample, Attachment 5).

. . .

4.  The Hearings Officer must obtain permission from the Manager of the Offender Discipline Unit to hold a Disciplinary Hearing after the 15/30 calendar day deadline for any reason other than an Authorized Continuance or suspension of this operating procedure due to an institutional emergency.  The Hearings Officer must request permission for the continuance within three working days after the deadline for the hearing.

2016 VDOC OP 861.1 at 26-28.

On August 9, 2017, still waiting to be released from segregation, Shaw

wrote a letter to Karen Stapleton, the Offender Discipline Unit Manager based in

Richmond, to inform her that "officials at Sussex 1 State Prison were manipulating

7

[VDOC's] Operating Procedure 861.1 to subject offenders accused of committing 137 offenses to unauthorized terms of segregation" and to ask her to "stop what was happening." JA65. He wrote OFFENDER DISCIPLINE UNIT on the envelope and sent it using the prison's bulk mail system. *Id.*

On August 10, 2017, Shaw submitted another Informal Complaint complaining that "they will not let me go." JA30. Shaw stated: "I've written Richmond already but I'm trying to give officials here a fair chance to respond." *Id.*[2]

That same day, Shaw sent a separate disciplinary appeal in the mail. Like with his letter to Stapleton the day before, Shaw wrote OFFENDER DISCIPLINE UNIT on the envelope and used the prison's bulk mail system. JA65.

On August 15, 2017, Shaw received back in the mail—"with no envelope and no letter explaining anything," JA65-66—the disciplinary appeal he had sent on August 10. Shaw wrote a letter explaining what had happened and resubmitted his appeal that day, August 15, 2017, again using the prison's bulk mail system. JA83; JA217-19 (version attaching disciplinary appeal).

On August 16, 2017, the appeal came back again, this time with "a memo attached telling [Shaw] to mail [his] appeal to the address that was high-lighted on

---

[2] The document is stamped "RECEIVED AUG 21 2017," with Unit Manager Murphy's signature dated August 23. JA30.

the form." JA66.  Shaw resubmitted his appeal yet again, writing on the back of his first letter that "[t]his is the 2nd time my appeal came back in the mail" and that prison staff were "opening all the mail that simply has 'Offender Discipline Unit' on it now so that no more letters get out informing you'all of what's happening here." JA84; *see* JA23; 4th Cir. Dkt. 11 at 12-13.

### C.  Shaw Is Convicted and Sent to Red Onion Without Review of Video Evidence

On August 17, 2017, Hearings Officer Leabough arrived in the segregation pod and asked Shaw whether he wanted to waive his right to 24-hour preparation for a hearing.  JA66.  Shaw's hearing never was rescheduled, and this "caught [him] off guard."  JA24.  Shaw's "main concern was being transferred to Wallens Ridge or Red Onion for something I did not do."  *Id.*  He waived his right to 24-hour preparation:  "I was sure that, upon reviewing the video evidence I would be found not guilty of the offense and, finally, released from seg[regation]."  *Id.*  But Leabough refused to review the video.  *Id.*; JA66-67.

Shaw explained:  "Instead of looking at the video evidence, Leabough chastised me for wanting to rely on the video evidence[,] telling me that I should have summoned some witnesses."  JA25.  During the hearing, "a Trainee," who had been in the pod that housed Shaw for only a couple of days, testified that she "was positive of her identification" of Shaw being the person she saw in the shower.  JA24-25.

9

The Disciplinary Offense Report states that the reporting officer "was for certain" that Shaw committed the offense and that Shaw "did not have enough evidence to support his defense." JA185. "Therefore he was found guilty." *Id.* The penalty imposed was "6 – Disciplinary Segregation – Imposed Value: 15 Days." *Id.*; *see also* JA143 (¶ 6).

After the hearing, Unit Manager Foreman conducted the Institutional Review of Shaw's disciplinary hearing to determine whether proper procedures were followed. Although Leabough refused to review video evidence, and the hearing occurred beyond the applicable deadline, Foreman approved Leabough's guilty finding. *See* JA67; JA202. And, on August 22, 2017, Unit Manager Murphy conducted an Institutional Classification Authority ("ICA") review and recommended that Shaw receive a "Security Level change to 5 – Maximum" and be transferred to Wallens Ridge or Red Onion based on his 137 conviction. *See* JA188 (¶ 6); JA190. Murphy "did not review any video evidence concerning Shaw's disciplinary offense." JA188 (¶ 6).

On August 31, 2017, Shaw again wrote to Stapleton. JA21-26. Shaw detailed the events preceding and including his disciplinary hearing, including that Leabough refused to consider the video evidence and "chastised" Shaw for requesting its consideration. JA25. He asked Stapleton to "preserve the video evidence from Housing Unit 4-A pod, on July 19, 2017, from 3pm to 330, if the

10

entire day cannot be saved." JA26. Shaw stated he was not sure Stapleton had

received his August 9, 2017 letter because prison officials were "opening mail

addressed to the Offender Discipline Unit." JA21. Shaw sent the August 31 letter

"under someone else's name . . . in case my mail is being tampered with." JA26.

Stapleton responded that she lacked authority to preserve the security footage.

JA28.

After remaining in segregation since July 20, 2017, Shaw was transferred to

Red Onion State Prison on September 18, 2017. JA73.

## II. Procedural History

### A. Shaw's Pleadings

Shaw filed a civil rights complaint under 42 U.S.C. § 1983, asserting two

claims for violations of his constitutional rights: a First Amendment retaliation

claim and a procedural due process claim. Shaw named as defendants Unit

Manager Murphy, Unit Manager Foreman, Hearings Officer Leabough, Counselor

Leach, and Lieutenant Adams. JA6, 8, 12. The complaint seeks money damages

and disciplinary penalties. JA11. The initial complaint included three exhibits—

the Informal Complaint dated August 10, 2017; the letter to Stapleton, Offender

Discipline Unit Manager, dated August 31, 2017; and her response dated

September 26, 2017. JA20-30.

The district court issued an order screening Shaw's complaint. In describing Shaw's allegations, the court understood that Shaw "went on a hunger strike and filed emergency grievances, informal complaints, and request forms to spark an investigation" into the validity of the charge against him and that he wrote to the Offender Discipline Unit "to apprise an outside party of the conduct of the prison officials" but that they "intercepted" the correspondence. JA34-35. The court further acknowledged that Shaw "requested that prison officials review video records to confirm his story" and that, "[a]fter allegedly hearing testimony from a trainee implicating plaintiff, Officer Leabough found plaintiff guilty of the charge, apparently without first examining surveillance footage." *Id.* The court nonetheless concluded that Shaw "ha[d] not alleged a violation of his due process rights" and "appear[ed] to claim that defendants retaliated against him for exercising his rights under the First Amendment." JA37. For both claims, the court directed Shaw "to provide additional information in a particularized and amended complaint." JA34.

Shaw filed an amended complaint that included three new exhibits—his two Informal Complaints (dated July 21 and 31, 2017) and a third exhibit containing the letters he wrote (on August 15 and 16) seeking to resubmit his disciplinary appeal. JA77-84. Shaw also filed two supplemental letters in an attempt to clarify

his claims.  JA40-54.  The district court treated these documents collectively as Shaw's amended pleadings.  JA86.

## B.      The District Court's Orders Dismissing Shaw's Claims

On February 1, 2019, the district court dismissed Shaw's procedural due process claim under 28 U.S.C. § 1915A(b)(1), reasoning that "Plaintiff cannot successfully allege facts to support both prongs of th[e] test" to establish a protectable state-created liberty interest.  JA89.  However, the court concluded that Shaw had "alleged sufficient facts to support his First Amendment retaliation claim" that defendants "deci[ded] to find plaintiff guilty of a 137(A) offense after his decision to grieve the conditions he claims to have faced."  JA87-88.  The court granted Shaw's request to proceed in forma pauperis and ordered defendants to respond to the complaint.  The court further stated that "[i]t is normal practice in *pro se* prisoner civil actions for defendants to file dispositive motions, if warranted and appropriate, before the start of discovery."  JA91.[3]

_____

[3] On February 9, 2019, Shaw wrote a letter to the district court seeking further review of the court's order dismissing his due process claim:  "I would like to challenge that decision but I don't know how?  So, I've enclosed a Notice of Appeal and a Motion for Reconsideration.  I'm not sure which, if either, option is appropriate."  JA97.  The court denied the motion for reconsideration, again concluding that Shaw could not establish a protected state-created liberty interest.  *See* JA108-10.  Thereafter, this Court docketed the appeal, which Shaw voluntarily dismissed.  *See* 4th Cir. No. 19-6882, Dkts. 7, 8.

Defendants then filed an Answer and Motion for Summary Judgment, with affidavits from Murphy, Leabough, Leach, and Adams, but not Foreman. JA111-97. Murphy's and Leabough's affidavits each enclosed exhibits.[4] Shaw filed a brief in opposition, enclosing four exhibits. JA198-226. Consistent with his prior pleadings, Shaw maintained that defendants refused to review "exculpatory video evidence" to transfer him to Red Onion in retaliation for submitting grievances. JA206.

The district court granted summary judgment for defendants, concluding that "the undisputed factual record demonstrates that there was no causal connection between plaintiff's alleged First Amendment activity and defendants' alleged retaliatory conduct." JA227. The court stated that, although reviewing the record "was a strenuous process," it "does not reveal the existence of any" evidence that would support "an inference that the defendants knew about plaintiff's letter and thus offered him an unfair hearing in response to it." JA227, 237.[5]

---

[4] Leabough's affidavit enclosed a copy of Operating Procedure 861.1RH, which is dated April 1, 2016 and has a last amended date of August 1, 2019. (The RH designation appears on each page after the first.) *See* JA145-83. As explained below, *see infra* p. 52, this could not have been the procedure in force at the time of Shaw's disciplinary conviction.

[5] Within one year, Shaw submitted a motion for relief from judgment under Federal Rule of Civil Procedure 60(b)(3), arguing that defendants committed fraud upon the district court by submitting a copy of Operating Procedure 861.1RH that indicated a disciplinary hearing could be held within 30 days, rather than the 15

Throughout the district court proceedings, "[n]o in-court hearings [were] held." JA245. And although Shaw challenged the sufficiency of defendants' evidence, *see* JA205-07, no discovery occurred.

## C.    This Appeal

Shaw filed an informal brief in this Court. 4th Cir. Dkt. 11. After appellants did not respond, this Court assigned appellate counsel and requested briefing. 4th Cir. Dkts. 13-14.

## SUMMARY OF ARGUMENT

**I.**    The district court erred in granting summary judgment for defendants on Shaw's First Amendment retaliation claim. Shaw presented evidence that satisfies each element of this claim: he engaged in First Amendment protected activity by filing grievances and writing letters to the Offender Discipline Unit; defendants adversely affected his First Amendment rights by convicting him and sending him to a supermax prison without review of video evidence at a hearing that took place beyond the applicable deadline; and there was a causal relationship between Shaw's protected activity and defendants' conduct. In particular,

---

days permitted for those offenders, like Shaw, who were held in pre-hearing detention. Shaw attached as an exhibit a document indicating that the Operating Procedure 861.1RH that Leabough submitted with her affidavit did not become effective until August 1, 2019. JA254. The district court denied Shaw's motion for relief from judgment, reasoning that "defendants were entitled to judgment regardless of the specific version of the Operating Procedure in effect at the time of the incidents complained of." JA262.

defendants knew about the grievances Shaw filed and the letters he wrote to
Richmond, and the temporal proximity between that protected activity and the
unfair hearing was very close and thus sufficient to support an inference that
defendants acted with retaliatory intent. The court erred by applying the incorrect
legal standard, requiring Shaw to establish "but for" causation in the first instance
in violation of *Martin v. Duffy*, 977 F.3d 294, 299-300 (4th Cir. 2020). The court
also erred in adjudicating Shaw's claim without affording any opportunity for
discovery, which is crucial for establishing defendants' subjective, retaliatory
intent.

      **II.**    The district court erred in dismissing Shaw's procedural due process
claim. Shaw had a protected state-created liberty interest in avoiding confinement
at a supermax facility. And Shaw alleged that defendants refused to review
exculpatory video evidence at a disciplinary hearing leading to his conviction and
transfer. That refusal deprived Shaw of a liberty interest without due process of
law under this Court's decision in *Lennear v. Wilson*, 937 F.3d 257, 270, 272 (4th
Cir. 2019), which recognizes that prisoners have a qualified right to compel prison
officials to review video evidence at a disciplinary hearing. Moreover, because
Shaw is a prisoner who brought civil rights claims pro se, the district court had an
obligation to construe Shaw's pleadings liberally to raise the strongest arguments
that they suggest, yet the court failed to do so.

**III.**     This Court should advise the district court on remand to appoint counsel to represent Shaw in litigating his civil rights claims.  The district court stated that reviewing the record was a strenuous process, and counsel would help to elucidate the record and merits of Shaw's claims.  Appointment of counsel also would help sharpen the presentation before the court and thus advance the sound administration of justice.

**STANDARDS OF REVIEW**

This Court generally reviews de novo a district court's grant of summary judgment.  *See Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016).  "But when a district court—as here—grants summary judgment without discovery, we review that procedural decision for abuse of discretion."  *Pledger v. Lynch*, 5 F.4th 511, 524 (4th Cir. 2021).  "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Raynor*, 817 F.3d at 128 (quoting Fed. R. Civ. P. 56(a)).  "In deciding whether a genuine issue of material fact exists, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (alteration in *Raynor*).  This Court "must accept [Shaw's] version of the facts since the District Court granted summary judgment against him."  *Bishop v. Wood*, 426 U.S. 341, 347 (1976).

17

This Court reviews de novo a district court's dismissal for failure to state a claim under 28 U.S.C. § 1915A. *See Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015). "A complaint should not be dismissed for failure to state a claim 'unless "after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."'" *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002), quoting in turn *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). This Court "read[s] the pleadings of a pro se plaintiff liberally and interpret[s] them 'to raise the strongest arguments that they suggest.'" *Martin v. Duffy*, 977 F.3d 294, 298 (4th Cir. 2020) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Moreover, "[w]hen a dismissal issue under § 1915A implicates a civil rights complaint," this Court "'must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *LaMar v. Ebert*, 681 F. App'x 279, 284 (4th Cir. 2017) (per curiam) (quoting *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 248 (4th Cir. 2005)).

## ARGUMENT

The district court erred in dismissing both of Shaw's claims.

For Shaw's retaliation claim, the district court applied the incorrect legal standard on causation, improperly requiring Shaw to establish "but for" causation in the first instance. *See Martin v. Duffy*, 977 F.3d 294, 299-300 (4th Cir. 2020). A reasonable jury could return a verdict for Shaw on the evidence presented. But if there is any doubt, the district court's precipitous grant of summary judgment—before any discovery occurred—warrants reversal.

For Shaw's due process claim, the district court's decision contravenes this Court's decision in *Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019), which recognized that prisoners have a constitutional right to compel review of video evidence at a disciplinary proceeding—which in Shaw's case led to transfer to a supermax prison. And the court did not follow the requirement to construe pro se prisoner civil rights claims liberally to raise the strongest arguments possible.

Finally, this Court should recommend that the district court on remand appoint *pro bono* counsel for Shaw to litigate these claims. *See Brooks v. Johnson*, 924 F.3d 104, 122 n.9 (4th Cir. 2019).

## I.    Shaw's Retaliation Claim Survives Summary Judgment

To prevail on a First Amendment retaliation claim, a prisoner-plaintiff must show that (1) he engaged in First Amendment activity, (2) the defendants took

19

some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendants' conduct. *See Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017). Shaw satisfied each of those elements. The district court erred in granting summary judgment for defendants by applying an incorrect legal standard and dismissing the claim before any discovery occurred.

### A.    Shaw Engaged in Protected First Amendment Activity

"The First Amendment protects the right to petition the Government for a redress of grievances, and the Supreme Court has recognized that prisoners retain this constitutional right while they are incarcerated." *Martin*, 858 F.3d at 249 (citations omitted). Thus, an inmate has a First Amendment right to be free from retaliation for filing grievances. *See Booker v. South Carolina Dep't of Corr.*, 855 F.3d 533, 546 (4th Cir. 2017).

After having been confined in pre-hearing detention, Shaw filed several informal complaints seeking to compel prison officials to review video evidence and secure his release. *See* JA62; JA62-63 ("I began a hunger strike as a peaceful protest [of] my assignment [to] segregation"; describing "Emergency Grievance" and "Informal Complaints" filed); JA79 (Informal Complaint dated July 21, 2017); JA81 (Informal Complaint dated July 31, 2017). Then, on August 9, 2017, Shaw wrote to Karen Stapleton, the Virginia Department of Corrections' Offender

Discipline Unit Manager based in Richmond, to complain about prison officials "subjecting offenders to terms of unauthorized segregation." JA72; *see also* JA200. In an Informal Complaint dated August 10, 2017, Shaw also alerted prison officials that "I've written Richmond already but I'm trying to give officials here a fair chance to respond." JA30. And on August 15 and August 16—after twice receiving a letter back, opened—Shaw tried again and again to re-send his letter to the Offender Discipline Unit, writing that "staff here at Sussex 1" are "opening all the mail" "so that no more letters get out informing you'all of what's happening here." JA84. The district court appropriately found that Shaw presented sufficient evidence that he engaged in First Amendment protected activity. *See Booker*, 855 F.3d at 543 ("[F]iling a grievance is protected First Amendment conduct.").

## B. Defendants' Conduct Adversely Affected Shaw's First Amendment Rights

"For purposes of a First Amendment retaliation claim under Section 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Martin*, 858 F.3d at 249 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)) (brackets omitted). A refusal to review exculpatory video evidence at a disciplinary hearing—and thus the prospect of an erroneous conviction and punishment— would intimidate a person of ordinary firmness from exercising First Amendment

21

rights. *See Lennear*, 937 F.3d at 269 (recognizing right to access and compel review of video surveillance evidence at disciplinary hearing "constitutes an essential aspect of the inmate's due process right to 'marshal facts in his defense'") (quoting *Gibbons v. Higgins*, 1995 WL 761743, at *2 (7th Cir. Dec. 20, 1995) (judgment noted at 73 F.3d 364)). Likewise, this Court has recognized that confinement in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment rights. *See Martin*, 858 F.3d at 250.

The district court correctly concluded that "the record contains sufficient evidence that would allow a factfinder to conclude that plaintiff suffered adverse action at the hands of the defendants." JA236. But the court failed to appreciate the full scope and nature of the intimidation Shaw presented, and, as explained below, this error infected the court's causation analysis. Based on the record, a jury could find that defendants took adverse action against Shaw by convicting him, increasing his security level, and transferring him to a supermax while (1) refusing to review the video surveillance evidence; (2) subjecting him to a delayed disciplinary hearing, the timing of which violated applicable regulations; and (3) keeping him in pre-hearing segregated detention after defendants' authorization to do so had expired.

First, Shaw repeatedly alleged—in his initial complaint, amended complaint, brief opposing summary judgment, and even motion for relief from judgment—

that officials refused to review "exculpatory video evidence" in order to transfer

him to a higher security prison.

- Complaint: "[T]he letter that I sent to Mrs. Stapleton was intercepted by prison officials" who "decided to conduct an invalid hearing and find me guilty of a false charge, **by denying me exculpatory evidence**, for the sole purpose of subjecting me to an immediate security level increase and transfer to a higher security level prison." JA16 (emphasis added); *see* JA25 ("all Mrs. Leabough had to do was look at the video evidence," but instead "**Leabough chastised me for wanting to rely on the video evidence**"; "my transfer has been approved . . . because I upset someone by trying to inform [Stapleton] about what was going on here") (emphasis added).

- Amended Complaint: "[M]y hearing was conducted on August 17, 2017, (14) days beyond the deadline, where I was found guilty of committing the offense charged against me **after being denied the benefit of exculpatory video evidence**, and I was transferred to Red Onion State Prison on September 18, 2017." JA51 (emphasis added); *see* JA67 ("[W]hen I asked [Hearings Officer Leabough] to review the video evidence to see that what I was saying was true and she refused, I knew I was being railroaded.").

- Opposition to Summary Judgment: "**Leabough unreasonably refused to review exculpatory video evidence** so that she could render a guilty verdict against me." JA201-02 (emphasis added). Defendants "intentionally subjected me to an invalid hearing to find me guilty of a false charge, **by denying me exculpatory video evidence**, to, ultimately, have me transferred to a higher security facility in retaliation for writing the August 9, 2017, letter to Mrs. Stapleton." JA206 (emphasis added).

- Motion for Relief from Judgment: "[T]hey wanted to punish me for writing that letter so much that **they denied me a reviewal [sic] of the video evidence which would have proven my innocence**." JA250 (emphasis added).

Despite Shaw's numerous and consistent assertions that he was convicted and

transferred to a higher-level security prison while his repeated request to have the

23

video evidence reviewed was denied, the district court did not even mention this theory of adverse action. *See* JA233-36. That was error. *See Gordon v. Leeke*, 574 F.2d 1147, 1152 (4th Cir. 1978) (reversing grant of summary judgment against pro se inmate where district court "did not fully appreciate" record); *Martin*, 977 F.3d at 298 (courts must interpret pro se pleadings "to raise the strongest arguments that they suggest").

Moreover, nothing in the record—incomplete as it is—refutes that Shaw was denied the review of video evidence, convicted, and sent to Red Onion. Hearings Officer Leabough submitted an affidavit stating, "I found Shaw guilty based on the testimony provided during the hearing." JA143 (¶ 6). The Disciplinary Offense Report that Leabough attached to her affidavit stated the "Reason for Decision" was that the reporting officer (whom Shaw pointed out was a trainee on the job for just a couple of days) "was for certain" that Shaw was the offender, and Shaw "did not have enough evidence to support his defense." JA185. Leabough did not deny that she refused to review the video surveillance evidence. *See* JA142-44. And none of the other defendants did either—in fact, Murphy affirmatively stated that he recommended transferring Shaw to a supermax but "did not review any video evidence" for Shaw. JA188 (¶ 6); *see also* JA190 (showing Murphy recommended "Security Level change to 5 – Maximum" and "[t]ransfer to Red Onion State

24

Prison" "based on 137 conviction"). Thus, a jury could conclude that Shaw

suffered adverse action.

Second, evidence shows that Shaw was convicted and transferred to a

supermax after being subjected to a disciplinary hearing that occurred beyond

the deadline authorized under applicable procedures. The district court correctly

concluded that "[t]here *is* evidence" that Shaw "did not receive a disciplinary

hearing until after the date envisioned by VDOC Operating Procedures." JA235.

The court explained that "a person of ordinary firmness may well decide not to

exercise his First Amendment rights if doing so means facing the specter of an

indefinitely-pending disciplinary hearing and the concomitant threat of disciplinary

sanctions." *Id.*[6]

Third, evidence shows that Shaw was kept in segregation beyond the time

period authorized. This Court has recognized that "placing an inmate in

administrative segregation could deter a person of ordinary firmness from

---

[6] The district court nonetheless granted summary judgment on this theory
of retaliation because, given that the 15-day deadline to hold a hearing expired
on August 4, 2017 and Shaw wrote to Stapleton on August 9, "*any* hearing he
received after he wrote a letter to Karen Stapleton would have been untimely
provided" and thus Shaw could not establish causation. JA236-37. But the court
failed to appreciate that the disciplinary hearing was necessary for the conviction,
and thus the protected conduct could prompt an untimely and unfair hearing as
retaliation. Moreover, Shaw wrote other grievances and complaints before the
15-day deadline lapsed on August 4. *See supra* pp. 4-6; JA24 ("[Unit Manager]
Murphy was just dragging me along as punishment for all the paperwork and the
hunger strike").

exercising his First Amendment Rights." *Martin*, 858 F.3d at 250 (internal quotation marks omitted). If placement in segregation can constitute adverse action for a retaliation claim, then continued confinement in segregation can too.

Shaw remained in segregation in violation of the prison's operating procedure. Shaw provided to the district court excerpts of the January 1, 2016 VDOC Operating Procedure 861.1. *See* JA215; JA256-57. Under those rules, there was a "15-day time limit" within which to hold a disciplinary hearing on a given charge. JA215 (Section XIII(A)(3)). Because Shaw had been placed in pre-hearing detention, the hearing needed to occur "no later than 15 calendar days after service of the *Disciplinary Offense Report*, unless a valid reason exists." *Id.* (Section XIII(A)(2)). The document further specified that "[a]n Authorized Continuance [wa]s required for a hearing not completed within . . . 15 calendar days if the offender is assigned to [pre-hearing detention]," as Shaw was. *Id.* (Section XIII(B)(1)). The record does not reflect any "Authorized Continuance" was sought for Shaw's hearing, nor that a "valid reason" was offered for holding the hearing beyond the deadline.[7] As such, a reasonable jury could conclude that

---

[7] The procedure further states that "[t]he Hearings Officer must obtain permission from the Manager of the Offender Discipline Unit to hold a Disciplinary Hearing after the 15/30 calendar day deadline for any reason other than an Authorized Continuance or suspension of this operating procedure due to an institutional emergency." JA257 (Section XIII(B)(4)). Again, the record does not reflect that Hearings Officer Leabough sought or obtained permission to hold Shaw's disciplinary hearing beyond the 15-day deadline.

26

Shaw suffered adverse action when defendants kept him in segregated confinement in response to his petitions for redress of grievances.

### C.    Shaw Made Out a Prima Facie Case on Causation

As a threshold matter, the district court applied the incorrect legal standard for establishing causation on a prisoner's retaliation claim.  Citing a Tenth Circuit decision—*Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)—the court held that "an inmate must show that, but for his decision to exercise his rights, the defendant would not have taken the allegedly retaliatory act."  JA236.  That was error.  In *Martin v. Duffy*, this Court rejected that standard—and the Tenth Circuit's decision in *Peterson*—holding instead that a "burden-shifting approach" applies to prisoners' retaliation claims.  977 F.3d at 299-300.[8]  This Court explained that a plaintiff need not establish in the first instance that defendants would not have engaged in the alleged retaliation "but for" the protected activity, for that would "place[] too weighty a burden on the individual arguing he was punished for exercising his constitutional rights" and "would be extraordinarily difficult for a prisoner to show."  *Id.* at 300.  Instead, a prisoner-plaintiff asserting a First Amendment retaliation claim need only make out a prima facie case of

---

[8] Even before *Martin*, this Court had "recognized that the analysis for causation is identical under § 1983 and Title VII of the Civil Rights Act of 1964, as amended."  *Gregg-El v. Doe*, 746 F. App'x 274, 275 n.2 (4th Cir. 2019) (per curiam) (citing *Causey v. Balog*, 162 F.3d 795, 804 (4th Cir. 1998)).

retaliation, at which point the burden shifts to the defendants to establish by a preponderance of the evidence that they would have made the same decision absent the protected conduct. *See id.* at 299.

To make out a prima facie case, a plaintiff must show that "his protected conduct was a substantial or motivating factor in the defendant's decision to take adverse action." *Id.* at 301. "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, [1] that the defendant was aware of h[is] engaging in protected activity" and [2] "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501; *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("very close" temporal proximity alone may suffice "to establish a prima facie case"); *Gregg-El*, 746 F. App'x at 275-76 (reversing summary judgment and observing that "temporal proximity between [prisoner-plaintiff's] complaints and [official's adverse action] may support an inference of causation").

Here, Shaw made out a prima facie case that defendants took each of the three adverse actions against him in response to his protected activity.

**1.** Defendants were aware of Shaw's informal complaints and August 9 letter to Karen Stapleton, informing her that he and others were being subjected to unauthorized segregated detention. As Shaw alleged, defendants knew about this letter because they were opening bulk mail. *See* JA65-66; JA204. As evidence of

defendants opening bulk mail, Shaw attached to his amended complaint the August 15 and August 16 letters that he attempted to send with this disciplinary appeal to the Offender Discipline Unit; the August 16 letter stated that "staff here at Sussex 1" are "opening all the mail" "so that no more letters get out informing you'all of what's happening here." JA84. The district court faulted Shaw for not providing the attached memo "through which [he] was allegedly informed that his mail had been rejected" and discounted the letter as "offering an unsupported conclusion that his letters were being screened." JA238. But that conclusion set the bar too high, where segregated "confinement undoubtedly curbed [Shaw]'s ability to collect direct or circumstantial evidence of retaliatory animus in the days and weeks immediately following his grievance." *Martin*, 977 F.3d at 300. Indeed, Shaw explained in his Informal Brief before this Court that he had "submitted the memo paper to the Offender Discipline Unit as proof of what he was complaining about," but the memo was not returned to him with "a copy of his letters." 4th Cir. Dkt. 11 at 13. And, importantly, beyond general and untested denials of retaliation,[9] defendants did not dispute Shaw's assertions.

---

[9] Defendants cannot use "untested affidavit testimony" to obtain summary judgment, particularly where the plaintiff "has not had a reasonable opportunity to take discovery." *Jiggets ex rel. S.J. v. Long*, 510 F. App'x 278, 286 (4th Cir. 2013) (affirming denial of summary judgment in § 1983 action); *see id.* (" '[S]elf-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment.' ") (quoting *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004)) (emphasis in *Butts*).

Defendants did not deny that they opened bulk mail.  Defendants also did not deny that they knew Shaw had written to the Offender Discipline Unit.  *Cf.* JA228 n.1 (district court noting that "defendants refer in their argument section to a letter plaintiff claims to have drafted and sen[t] to a state official"); JA139-41 (Leach affidavit); JA142-44 (Leabough affidavit); JA196-97 (Adams affidavit).  In particular, while Hearings Officer Leabough convicted Shaw while refusing to review video evidence, in her affidavit she did not deny her awareness of Shaw's August 9 letter to Stapleton and did not deny that she retaliated against him for writing it.  *See* JA142-44.  And while Unit Manager Foreman refused to review the video evidence, *see* JA79 (Informal Complaint dated July 21, 2017), and later approved the conviction as following proper procedures, *see* JA66-67, she did not submit an affidavit at all.

Murphy stated in his affidavit that "I have no knowledge of Shaw's correspondence to Ms. Stapleton" and "did not retaliate against Shaw for writing to Ms. Stapleton."  JA189 (¶ 7).  But the record shows a material question of fact on that issue.  In the August 10, 2017 Informal Complaint, Shaw complained that "my status is segregation and they will not let me go.  **I've written Richmond already** but I'm trying to give officials here a fair chance to respond."  JA30 (emphasis added).  That Informal Complaint is stamped "RECEIVED AUG 21 2017" and signed by Murphy on August 23, 2017.  *See id.*  Thus, there is a factual question

30

whether Murphy *was aware* of Shaw's correspondence to more senior officials in

Richmond before Murphy conducted the ICA review on August 22 at which he

recommended Shaw's security level increase to maximum and transfer to Red

Onion based on his conviction.  *See* JA188 (¶ 6); JA190.  Shaw explained to the

district court that he included the August 10 Informal Complaint as an exhibit "as

proof that I did write Mrs. Stapleton on August 9, 2017."  JA17.  But the district

court overlooked it.  *See Gordon*, 574 F.2d at 1152 (reversing summary judgment

where "the district court did not fully appreciate" record).  Moreover, Murphy

knew about Shaw's request—before his August 17 disciplinary conviction—"to

review the video in order to rectify the situation."  JA81 (Informal Complaint dated

July 31, 2017 and signed by Murphy on August 7, 2017).  Thus, Murphy's denial

that "I did not retaliate against Shaw for writing to Ms. Stapleton," JA189 (¶ 7),

is an incomplete response even if credited.

> **2.**    From the close temporal proximity between the protected activity and

the adverse action, a reasonable jury could infer retaliatory intent.  Only eight days

elapsed from when Shaw wrote the August 9, 2017 letter to Stapleton to his

disciplinary conviction on August 17.  And in the intervening time period, he had

notified defendants on August 10 that he had "written Richmond," JA30, and

complained on August 16 that "staff here at Sussex 1" are "opening all the mail"

"so that no more letters get out informing you'all of what's happening here," JA84.

The very close temporal proximity between Shaw's August 9 letter and the August 17 adverse action suffices to establish a prima facie case on causation. *See Constantine*, 411 F.3d at 501 (four months between complaint and retaliatory conduct can suffice to establish causal connection); *Gregg-El*, 746 F. App'x at 275 (one-month gap can support "an inference of causation"). Shaw's conviction and transfer to a higher security facility—based on a hearing that occurred out of time and at which officials refused to consider video evidence—all happened mere days after Shaw filed his grievances.

Shaw also made out a prima facie case that defendants continued to hold him in pre-hearing segregated detention beyond the permissible 15-day deadline in retaliation for his protected activity. After the scheduled time for his hearing (July 27) elapsed, Shaw began a hunger strike and started writing a series of grievances and informal complaints to prompt the prison guards to review the video evidence and secure his release. He wrote informal complaints on July 21, July 31, and August 10, and letters to Richmond complaining about conditions of confinement on August 9, August 16, and August 31. Defendants responded to the complaints and never denied that they were aware of them. Yet, after the August 4 deadline to hold a disciplinary hearing had passed, and as Shaw continued to write grievances, defendants kept Shaw in pre-hearing detention without explanation until the hearing on August 17 and then, as a result of the conviction, until his transfer to

Red Onion on September 18.  A reasonable jury could infer that defendants retaliated against Shaw by continuing to keep him in segregation in response to his series of grievances protesting the conditions of his confinement and their repeated refusal to review the video evidence.

The district court reasoned that the August 9 letter alone could not spur retaliation because Shaw wrote it after the 15-day deadline to hold a hearing expired on August 4, 2017, and after he was placed in segregation on July 20, 2017.  *See* JA236.  But the court failed to appreciate that, as soon as the 15-day deadline for a hearing lapsed, the basis for *pre*-hearing detention—which the operating procedure itself defines as "awaiting a Disciplinary Hearing,"[10]— expired.  And allegedly in retaliation for exercising his First Amendment rights, Shaw was kept in segregation and then convicted in a procedurally compromised hearing and transferred to a supermax prison.

In granting summary judgment on causation, the district court also mistakenly relied on *Wagner v. Wheeler*, 13 F.3d 86, 91 (4th Cir. 1993).  *See* JA237.  In *Wagner*, a former state employee argued that he was wrongfully terminated not because of his "long history of poor performance and

---

[10] 2016 VDOC OP 861.1 at 2, Section III.  The Operating Procedure 861.1RH that Leabough submitted with her affidavit, which did not become operative until after the events here, *see infra* p. 52, does not include a definition of "pre-hearing detention."  *Compare* JA145-46.

33

insubordination" but in retaliation for reporting two alleged violations of environmental regulations committed by his employer. 13 F.3d at 88-89. This Court found that the reprimands the county gave Wagner shortly after he reported environmental problems were for failure to address a "fire hazard" and "follow [the employer's] directions"—in other words, Wagner faced "ostensibly legitimate reasons given for his termination." *Id.* at 90-91 & n.3.

Here, by contrast, defendants offered no justification for refusing to consider the video surveillance evidence to which Shaw had a constitutional right. *See Lennear*, 937 F.3d at 272. Nor did defendants offer any justification for delaying his disciplinary hearing and thereby keeping him in segregation well beyond the authorized deadline. Moreover, in *Wagner*, the termination that prompted suit happened nearly two *months* after Wagner's reports about alleged environmental violations. *See* 13 F.3d at 88, 91 n.3 (noting Wagner made reports on February 26 and March 10 but was not terminated until April 22). Here, within *days* of writing to Stapleton, Shaw was subjected to a delayed and procedurally compromised hearing at which he was denied video evidence to establish his defense.

Shaw established a prima facie case of retaliation, and defendants offered no justification to rebut the presumption that his protected activity prompted their adverse actions against him. *See Martin*, 977 F.3d at 299 (citing *Greene v. Doruff*,

34

660 F.3d 975, 979 (7th Cir. 2011)).  The district court thus erred in granting

summary judgment for defendants.

### D. The District Court Erred in Granting Summary Judgment Before Any Discovery Occurred

There is sufficient evidence to support the inference that defendants

retaliated against Shaw so as "to preclude judgment as a matter of law and require

submission to a jury." *Pledger v. Lynch*, 5 F.4th 511, 525 (4th Cir. 2021).  But

even if there were not, the court erred in granting summary judgment precipitously,

without "an opportunity to engage in discovery." *Id.*

"In general, summary judgment should only be granted 'after adequate time

for discovery.'" *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th

Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  And

"summary judgment prior to discovery can be particularly inappropriate when a

case involves complex factual questions about intent and motive." *Harrods Ltd. v.

Sixty Internet Domain Names*, 302 F.3d 214, 247 (4th Cir. 2002); *see also*, *e.g.*,

*Raynor v. Pugh*, 817 F.3d 123, 130 & n.5 (4th Cir. 2016); *Putney v. Likin*, 656 F.

App'x 632, 639-40 (4th Cir. 2016) (per curiam) (reversing summary judgment

against prisoner's Eighth Amendment claim because "essentially all of the

evidence [plaintiff] seeks is in the possession of [prison] officials").

The district court erred by prematurely granting summary judgment before

discovery.  While defendants provided notice under *Roseboro v. Garrison*, 528

F.2d 309 (4th Cir. 1975) (per curiam), advising Shaw of his right to file additional material in opposition to defendants' motion for summary judgment, *see* JA193-94, Shaw was not "given an opportunity to obtain such material through discovery," *Pledger*, 5 F.4th at 525.  On the contrary, the district court repeatedly invited defendants to file dispositive motions early, stating that "[i]t is normal practice in *pro se* prisoner civil actions for defendants to file dispositive motions, if warranted and appropriate, before the start of discovery."  JA91; *see* JA104 (same).  Shaw was "never informed of his right to seek discovery under Rule 56(d)," *Pledger*, 5 F.4th at 526, or that summary judgment is only appropriate "after adequate time for discovery," *Celotex*, 477 U.S. at 322.  It is therefore no surprise that he "never formally" requested it.  *Pledger*, 5 F.4th at 526.  But Shaw did ask the district court to direct defendants to provide the date when the operating procedure was amended to change the applicable hearing deadline from 15 to 30 days.  *See* JA207.  And he did challenge the sufficiency of defendants' evidence as to retaliatory intent, on which defendants bore the burden under the framework this Court recognized in *Martin*, 977 F.3d at 299-300.  *See* JA206 (challenging "defendants' evidence as to why my hearing was not invalid" and stating that "investigating the defendants' evidence" would preclude summary judgment).

As this Court has made clear, "'[s]ufficient time for discovery is considered especially important when the relevant facts'—here, facts bearing on the subjective

[intent] of the [corrections officer] defendants—are 'exclusively in the control of the opposing party.'" *Pledger*, 5 F.4th at 526 (quoting *Harrods*, 302 F.3d at 246-47) (first set of brackets in *Pledger*).[11]  Thus, Shaw "put the district court on fair notice of a potential dispute as to the sufficiency of the summary judgment record," and the court "abused its discretion in granting summary judgment in this posture." *Id.* at 526-27.

## II.    Shaw Stated A Procedural Due Process Claim

The Due Process Clause of the Fourteenth Amendment protects persons against deprivation of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  To state a procedural due process claim, a plaintiff must establish (1) "a protectable liberty interest in avoiding security detention" and (2) the deprivation of that interest without "minimally adequate process." *Incumaa v. Stirling*, 791 F.3d 517, 526 (4th Cir. 2015).  Construing the pleadings liberally as this Court must, Shaw satisfied both elements.

### A.    Shaw Adequately Alleged a Liberty Interest in Avoiding Erroneous Transfer to a Supermax Prison

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or

---

[11] Shaw also alleged that defendants conspired to violate his rights, *see* JA19; JA51; JA202, 210, and he should be allowed to develop that claim on remand.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).  The Supreme Court has held that "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement." *Id.*  But the Court also has declared that "state policies or regulations" may give rise to "a liberty interest in avoiding particular conditions of confinement" that impose "'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Id.* at 222-23 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  "Put differently, a prisoner claiming a violation of his right to procedural due process must show:  (1) that there is a 'state statute, regulation, or policy [that] creates such a liberty interest,' and (2) that 'the denial of such an interest "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."'" *Martin*, 858 F.3d at 253 (quoting *Prieto v. Clarke*, 780 F.3d 245, 248-49 (4th Cir. 2015), quoting in turn *Sandin*, 515 U.S. at 484) (alteration in *Martin*).

Here, Shaw adequately alleged a liberty interest in avoiding erroneous placement in a supermax facility.  He satisfied both prongs of the test.

First, Shaw alleged that he was convicted after "the deadline for conducting [his] hearing [had] expired" under VDOC written policy.  JA48.  He insisted that, once the deadline for the hearing had passed, he no longer should have been subject to conviction for the charged offense.  *See* JA202, 205, 207, 210-11.  Shaw pointed

to the VDOC January 1, 2016 Operating Procedure 861.1, which sets a 15-day deadline within which prison officials could hold a hearing for an alleged disciplinary offense for those inmates held in pre-hearing detention.  He alleged that, under the policy, defendants could have rescheduled his hearing if a valid reason existed but that they did not.  JA50.  Further, a full version of the policy, of which this Court can take judicial notice, mandates review "within 72 hours" of an offender's "placement on Pre-Hearing Detention" and requires that "the offender will be provided assistance, if requested, to . . . prepare a defense."  2016 VDOC OP 861.1 at 21-22, Section X(B).  It also states that a disciplinary hearing "is an administrative due process proceeding," that "sufficient evidence must be presented at the hearing to support a finding of guilt," and that one of the potential punishments for subsequent convictions within one year is review for possible security-level increase.  *See id.* at 2, 13, Sections IV(A), VI(B).  Based on this procedure, Shaw had an expectation that he would not be subjected to a security level increase and transferred to a higher-security prison without a procedurally adequate hearing.  Thus, Shaw "adequately alleged the existence of a state policy creating a protected liberty interest."  *Martin*, 858 F.3d at 253.

As for the second prong, Shaw also alleged that he was subjected to "atypical" and "significant hardship" compared to the general prison population.  JA48.  Specifically, Shaw alleged that he was "stripped of all privileges" compared

to the general prison population and transferred to "the most restrictive prison in Virginia"—Red Onion State Prison.  JA48, 51.[12]

Red Onion State Prison is a supermax facility.  *See Smith v. Collins*, 964 F.3d 266, 270 (4th Cir. 2020).  "Supermax facilities are maximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general prison population." *Wilkinson*, 545 U.S. at 213.  The Supreme Court has held that inmates have an "interest in avoiding erroneous placement" in a supermax prison. *Id.* at 225; *see Incumaa*, 791 F.3d at 530 ("[T]he Court concluded that incarceration in the Supermax environment was so atypical and significant that it would give rise to a liberty interest under any plausible baseline.") (internal quotation marks omitted).  Likewise, this Court has concluded that confinement at a supermax facility can give rise to a liberty interest.  *See Smith*, 964 F.3d at 269-70 (reversing summary judgment for defendants where plaintiff alleged procedural due process violation based on confinement at "one of VDOC's twin maximum-security facilities").

Shaw did not need to detail how the conditions of his confinement at Red Onion were atypical and harsh.  "[A]llegations such as those asserted by [Shaw],

---

[12] Shaw made these allegations in a letter that the district court properly treated as part of his amended complaint.  *See* JA86; *Martin*, 858 F.3d at 244 n.1 ("Because Martin's procedural due process claim concerning good time credits was alleged in documents attached to Martin's complaint, we construe the complaint to include such a claim.").

however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence." *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). In *Haines*, the Supreme Court held that "the District Court erred in dismissing [an inmate's] *pro se* complaint without allowing him to present evidence on his claims" even though the inmate provided "general allegations" about his "disciplinary confinement and denial of due process in the steps leading to that confinement." *Id.* Moreover, "[w]hether confinement conditions are atypical and substantially harsh in relation to the ordinary incidents of prison life is a necessarily fact specific comparative exercise," *Incumaa*, 791 F.3d at 527 (cleaned up), such that it ordinarily would be inappropriate to resolve on the pleadings alone. Unlike in *Martin*, where this Court dismissed a procedural due process claim because the complaint did not include "any factual allegations" regarding atypical and harsh conditions, 858 F.3d at 253, Shaw alleged that—based on a charge of stroking his penis in the shower—he lost all privileges, suffered an automatic security-level increase, and was transferred to a supermax facility. *See* JA48, 51.[13]

This Court long has held that "pleadings should not be scrutinized with such technical nicety that a meritorious claim should be defeated," especially for civil

---

[13] *See also* JA211 (insisting in opposition to summary judgment on retaliation claim that "the guilty verdict against me . . . resulted in my immediate transfer to Red Onion State Prison which is arguably one of the harshest prisons in the country").

rights plaintiffs proceeding pro se.  *Gordon*, 574 F.2d at 1151.  In *Gordon*, this Court confirmed that courts "must examine the *pro se* complaint to see whether the facts alleged, or the set of facts which the plaintiff might be able to prove, could very well provide a basis for recovery under any of the civil rights acts or heads of jurisdiction in the federal arsenal for redress of constitutional deprivations." *Id.*; *see LaMar v. Ebert*, 681 F. App'x 279, 284 (4th Cir. 2017) (per curiam). Under those controlling standards, Shaw adequately pleaded a state-created, protectable liberty interest in avoiding detention in supermax.

## B. Shaw Adequately Alleged a Due Process Violation when Defendants Refused To Review "Exculpatory Video Evidence"

The Supreme Court has recognized that constitutional procedural due process protections extend to prison disciplinary proceedings that could adversely impact an inmate's liberty interests.  *See Wolff v. McDonnell*, 418 U.S. 539, 555 (1974).  And this Court has held that "inmates, like [Shaw], have a qualified procedural due process right in disciplinary proceedings to access and compel official consideration of video surveillance evidence."  *Lennear*, 937 F.3d at 274.

Presaging this case, this Court in *Lennear* explained that such evidence "may well prove 'central to the construction of a defense,' as it could prove exculpatory (for example, if it counters a correctional officer's version of events)." *Id.* at 269 (quoting *Smith v. Massachusetts Dep't of Corr.*, 936 F.2d 1390, 1401 (1st Cir. 1991)).  "Video footage, like other forms of documentary evidence, is

particularly valuable to inmates in disciplinary proceedings because inmates, like

[Shaw], 'obviously face[] a severe credibility problem when trying to disprove

the charges of a prison guard.'" *Id.* (quoting *Hayes v. Walker*, 555 F.2d 625, 630

(7th Cir. 1977)) (second alteration in *Hayes*).

Here, Shaw alleged that he was subjected to an unfair hearing at which

officials convicted him after refusing to review "exculpatory video evidence."

JA50.  From the moment he was charged to the date of the hearing, Shaw

repeatedly asked officials to review the video surveillance footage to establish his

innocence and release him from segregation.  When Shaw first was informed of the

charge on July 19, 2017, he maintained his innocence and asked officials "to check

the video evidence."  JA61.  After being placed in segregation on July 20, 2017,

Shaw asked a lieutenant to "review the video evidence" but "he refused."  JA62.

Shaw then "began to write officials" to ask that they "look at the video evidence"

to "see that [he] did not commit the offense."  *Id.*  On July 21, 2017, Shaw wrote

an Informal Complaint to Unit Manager Foreman, explaining that he had been

"trying to tell everybody to review the camera."  JA79.  Foreman replied that she

was "not going to review the rapid eye for this situation" but that Shaw "can

request the hearings officer to do so."  *Id.*  On July 31, 2017, Shaw wrote another

Informal Complaint, this time to the Warden, explaining that "no-one has taken

initiative to review the video."  JA81.  Unit Manager Murphy replied that "the

hearings department will advise and resolve." *Id.* Shaw continued to request that officials review the video evidence, even as the deadline to hold a hearing (and thus the authority to impose any conviction or punishment for the disciplinary charge) expired. *See* JA64-65.

When Shaw finally had his hearing on August 17, 2017, he was "denied the benefit of exculpatory video evidence." JA51. As Shaw explained: "Instead of looking at the video evidence, [Hearings Officer] Leabough chastised me for wanting to rely on the video evidence[,] telling me that I should have summoned some witnesses as if I should have known that I would be misidentified and accused of an offense." JA25. Shaw was "identified by a Trainee who was in that pod [where Shaw was housed] for maybe her second day." JA24-25. Without the video evidence, Shaw "obviously face[d] a severe credibility problem when trying to disprove the charges of a prison guard." *Lennear*, 937 F.3d at 269. As a result and as alleged in his complaint, Shaw was found "guilty of a false charge" and suffered "an immediate security level increase and transfer to a higher security level prison." JA16.

Shaw's detailed account makes clear that he adequately alleged a deprivation of his constitutional right to access and compel consideration of the prison's video surveillance footage at the disciplinary hearing to protect himself from transfer to a supermax facility. Shaw's allegations sufficed to state a due

44

process claim. *See Martin*, 977 F.3d at 298 ("We read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'") (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).[14]

Indeed, the subsequent record confirms Shaw's allegations. In responding to the retaliation claim that the district court allowed to proceed beyond the screening stage, Hearings Officer Leabough submitted an affidavit in which she stated that "Officer Dent was also present for the hearing and provided testimony regarding the incident," but Leabough did not mention the video evidence or her refusal to review it in response to Shaw's request. JA143 (¶ 6).[15] And Unit Manager Murphy submitted an affidavit stating that, after the August 17 disciplinary hearing, he

---

[14] While Shaw's right to compel consideration of video evidence at the disciplinary hearing was a qualified one, a valid penological justification for denying such evidence would need to be "establishe[d] . . . under the particular facts of the case," *Lennear*, 937 F.3d at 273, and thus could not bar this claim at the pleadings stage. Moreover, "the universe of 'safety or correctional' interests justifying prison officials' refusal to *consider* video surveillance evidence will necessarily be smaller than [the] universe of interests sufficient to justify prison officials' refusal to provide access to such evidence." *Id.*

[15] While Shaw focused on the timing of his disciplinary hearing and at one point stated that Leabough "was not personally involved" in his due process claim, JA71, he repeatedly alleged that "she refused" to "review the video evidence," JA66-67; *see supra* pp. 9-10, 23. The two other defendants who submitted affidavits either affirmatively denied reviewing the video surveillance evidence, *see* JA140 (¶ 6) (Counselor Leach), or disclaimed memory of it, *see* JA196 (¶ 5) (Lieutenant Adams: "While I did have access to video footage, and sometimes reviewed the videos with other Lieutenants, I do not recall looking at video for Shaw or discussing the review of video with him.").

45

"conducted an ICA review of [Shaw's] housing status and recommended that he be transferred to Wallens Ridge or Red Onion State Prison" but "did not review any video evidence concerning Shaw's disciplinary offense" charge.  JA188 (¶ 6).

Moreover, Shaw's right to compel official consideration of the video evidence was clearly established at the time of his disciplinary hearing such that no qualified-immunity defense could defeat this due process claim at the pleadings stage.  Qualified immunity can shield public officials from the consequences of constitutional violations, but not if "'the right violated was clearly established' at the time of the official's conduct." *Booker*, 855 F.3d at 538 (quoting *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010)).  In *Lennear*, this Court determined that a prisoner had a qualified right to access and compel consideration of video evidence stemming from a disciplinary hearing that occurred in 2016, one year before the events at issue in this case.  *See* 937 F.3d at 263-67, 279.  And in *Lennear*, this Court determined that due process protections encompassing video surveillance evidence flowed from the Supreme Court's 1978 decision in *Wolff* and this Court's decisions, and followed "our sister circuits [that] universally have treated prison video surveillance evidence as a form of documentary evidence potentially subject to disclosure and review." *Id.* at 268.  All of that precedent predates what happened here, and thus the right at issue was clearly established by that time.  *See Booker*, 855 F.3d at 539 ("qualified immunity is lost when plaintiffs

point either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to 'a consensus of cases of persuasive authority'") (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff*, 418 U.S. at 558. Shaw's pleadings raised a serious due process claim that warrants reinstatement and further development at trial.

### C.   The District Court Erred in Dismissing Shaw's Due Process Claim

The district court initially found Shaw's due process claim deficient without providing any reasoning. *See* JA37 ("Plaintiff has not alleged a violation of his due process rights."). The court acknowledged that Shaw "state[d] that he requested that prison officials review video records to confirm his story" and that "Officer Leabough found plaintiff guilty" "without first examining surveillance footage." JA34-35. The court also correctly acknowledged that the Constitution guarantees Shaw procedural due process at a disciplinary hearing and protection against arbitrary imposition of punishment by prison officials. *See* JA36 (citing *Wolff*, 418 U.S. at 558). But the court failed to recognize that Shaw had a right to access and compel the review of video surveillance at the disciplinary hearing and

that the refusal to do so violated that right.[16] *See Lennear*, 937 F.3d at 279. That

law governs this case. *See Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711

(1974) ("a court is to apply the law in effect at the time it renders its decision").

After directing Shaw to re-plead, the district court again erred by dismissing

his procedural due process claim for failure to state a claim under 28 U.S.C.

§ 1915A(b)(1). This time, without referencing the denial of video evidence, the

court construed Shaw's due process claim as "grounded on the proposition that his

rights were violated when he was not released from segregation after officials'

failure to provide a timely hearing in accordance with VDOC procedures." JA87.

The court assumed without deciding that Shaw's citation to Operating Procedure

861.1 provided a state-created expectation in avoiding particular conditions of

confinement. JA89. As explained, Shaw adequately alleged the policy does give

rise to such an expectation. *See supra* pp. 38-39. The court then concluded that

Shaw "cannot successfully allege facts" to show atypical hardship because "a

temporary assignment to segregated confinement" does not suffice. JA89-90.

---

[16] The district court quoted a Second Circuit decision for the proposition that "a prisoner 'has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'" JA36 (quoting *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). But *Freeman*, of course, recognizes that inmates have "the right not to be deprived of a protected liberty interest without due process of law." 808 F.2d at 951.

That was error.  As explained, Shaw alleged not only that he was confined in pre-hearing segregation but also that his pre-hearing segregation led to a procedurally deficient hearing that resulted in a security level increase and transfer to Red Onion, "the most restrictive prison" in Virginia.[17]  JA51.

Finally, the district court further erred in denying Shaw's motion for reconsideration.  This time, the court held that Shaw did not have a liberty interest in "avoiding segregated confinement" under Operating Procedure 861.1 and that temporary segregation is not "harsh and atypical in relation to the ordinary incidents of prison life."  JA109.  The court acknowledged that "the provision of a hearing in accordance with the policy would in theory have offered plaintiff an opportunity to fight the charge that led to his placement in segregation," *id.*, but the court again failed to acknowledge that Shaw had complained of defendants' refusal to review the video evidence at the disciplinary hearing that resulted in his transfer to a supermax prison.  Ultimately, the court misapprehended the strength of Shaw's claim.  It focused on the fact that Shaw was not released from segregation

---

[17] Confirming the atypical hardship he suffered, the record reflects that Shaw was confined at Red Onion from September 18, 2017 to February 25, 2019.  *See* JA102; 4th Cir. No. 19-6882, Dkt. 10 (showing Shaw returned to Red Onion on January 20, 2021).  *Cf. Smith*, 964 F.3d at 268-69 (reversing grant of summary judgment for defendants where prisoner "spent over four years in solitary confinement at Wallens Ridge State Prison, a supermax correctional facility within the [VDOC]").

"as a result of an untimely hearing," *id.*, rather than on the transfer to supermax as a result of a conviction without review of critical evidence.

Shaw had a liberty interest under the VDOC procedure in avoiding transfer to a supermax prison, which entails harsh and atypical conditions in relation to the ordinary incidents of prison life. And defendants deprived him of that liberty without due process of law by refusing to review the relevant video evidence. District courts "'must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *LaMar*, 681 F. App'x at 284 (quoting *Slade v. Hampton Rds. Reg'l Jail*, 407 F.3d 243, 248 (4th Cir. 2005)). The district court erred under that standard.

## III. On Remand, Counsel Should Be Appointed To Litigate Shaw's Civil Rights Claims

"In the great run of *pro se* cases, the issues are faintly articulated and often only dimly perceived. There is, therefore, a greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done." *Gordon*, 574 F.2d at 1151. Indeed, "[i]f it is apparent to the district court that a *pro se* litigant has a colorable claim but lacks the capacity to present it, the district court should appoint counsel to assist him." *Id.* at 1153; *see* 28 U.S.C. § 1915(e)(1) (providing that the district

court "may request an attorney to represent any person unable to afford counsel"). This Court therefore advises district courts on remand to appoint counsel to assist prisoner pro se litigants in prosecuting claims of constitutional violations. *See Pledger*, 5 F.4th at 527 n.6 (concluding in *Bivens* action that "the district court may wish to consider appointing counsel to assist in litigating the case on remand" because "further factual development would be appropriate"); *Brooks*, 924 F.3d at 122 n.9 (suggesting in § 1983 action that "the court consider appointing counsel for Brooks to assist in litigating the case") (citing *Williams v. Collier*, 357 F. App'x 532, 536 (4th Cir. 2009) (per curiam) (similar)).

In this case, appointment of trial counsel for proceedings on remand is particularly appropriate to ensure the efficient presentation of issues and zealous advocacy for Shaw. The district court conceded that it was "a strenuous process" to analyze the record. JA227. But the court "did not fully appreciate" the record, *Gordon*, 574 F.2d at 1152, failed to interpret Shaw's pleadings "to raise the strongest arguments that they suggest," *Martin*, 977 F.3d at 298, and viewed Shaw's claims with so much skepticism that it gave unduly "broad deference" to the corrections officer defendants, *id.* at 306. Appointment of counsel on remand would help develop and sharpen the presentation of the legal and factual issues before the district court.

Moreover, defendants' conduct shows that appointment of counsel is warranted in this case for the sound administration of justice. In her affidavit, Leabough represented to the district court that Operating Procedure 861.1RH that she submitted with the 30-day deadline to hold disciplinary hearings was "effective April 1, 2016." JA142-43 (¶ 4). However, the Disciplinary Offense Report that she also submitted indicates that is incorrect—the report shows that the penalty Leabough imposed on Shaw was "6 – Disciplinary Segregation," whereas the version of Operating Procedure 861.1RH Leabough submitted provides that the sixth penalty is "[l]oss of good time," not disciplinary segregation. *Compare* JA185 (showing penalty imposed on Shaw) *with* JA157 (enumerating authorized disciplinary penalties under Section VI(A)). In his Motion for Relief from Judgment, Shaw shows that the procedure Leabough submitted did not become effective until August 1, 2019. *See* JA254. And the version of the January 1, 2016 Operating Procedure 861.1 on the VDOC website includes disciplinary segregation as the sixth penalty and the 15-day deadline for holding disciplinary hearings for prisoners held in pre-hearing detention. *See* 2016 VDOC OP 861.1 at 13, 27 (Sections VI(A), XIII). That version has a last amended date of November 6, 2017, indicating that the 15-day deadline applied during the July to September 2017 period relevant in this case. On remand, appointed trial counsel could help Shaw clarify the record and efficiently advance his civil rights claims.

## CONCLUSION

This Court should reverse the district court's orders.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument. This appeal presents important civil rights claims that require applying new decisional law and consideration of a record that the district court found "strenuous" to review. Oral argument would aid the decisional process.

Respectfully submitted,

/s/ *Daniel S. Severson*

DANIEL S. SEVERSON
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
dseverson@kellogghansen.com

*Counsel for Plaintiff-Appellant*

May 18, 2022

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 20-7185          **Caption:** Emmanuel King Shaw v. T.S. Foreman, et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ___12,709___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Word 2016 _____ [*identify word processing program*] in
Times New Roman 14-point _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Daniel S. Severson _____

Party Name Emmanuel King Shaw _____

Dated: May 18, 2022 _____

## CERTIFICATE OF SERVICE

I hereby certify that, on May 18, 2022, I electronically filed the foregoing Opening Brief for Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ Daniel S. Severson
Daniel S. Severson